**UNITED STATES DISTIRCT COURT
WESTERN DISTRICT OF ARKANSAS**

U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

**MAY 0 1 2012**

CHRIS R. JOHNSON, CLERK

BY _____

DEPUTY CLERK

| | |
|---|---|
| KATHRYN JOHNSTON LOMAX, Derivatively and on behalf of Nominal Defendant WAL-MART STORES, INC. | Case No. _12-404_ |
| PLAINTIFF, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| S. ROBSON WALTON, MICHAEL DUKE, H. LEE SCOTT, JIM WALTON, AIDA ALVAREZ, JAMES BREYER, M. MICHELE BURNS, JAMES CASH, ROGER CORBETT, DOUGLAS DAFT, GREGORY PENNER, STEVEN REINEMUND, ARNE SORENSON, CHRISTOPHER WILLAMS, AND LINDA WOLF, | Related to: Case No. 12-4041 SOH |
| | **JURY TRIAL DEMANDED** |
| DEFENDANTS, | |
| AND | |
| WAL-MART STORES, INC., | |
| NOMINAL DEFENDANT. | |

## OVERVIEW

1. This is a shareholder's derivative action on behalf of nominal defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") against its directors and officers for breach of fiduciary duty and other relief. Defendants S. Robson Walton, Michael Duke, H. Lee Scott, Jim Walton, Aida Alvarez, James Breyer, M. Michele Burns, James Cash, Roger Corbett, Douglas Daft, Gregory Penner, Steven Reinemund, Arne Sorenson, Christopher Willams, and Linda Wolf (collectively the "Individual Defendants"), current members of Wal-Mart's board of directors (the "Board"), have failed to respond adequately to a massive bribery scheme by Wal-Mart's Mexican subsidiary, Wal-Mart de Mexico. Many key officers and directors were informed of

this scheme but actively took steps to shut down an investigation of the scheme.  In fact, Eduardo Castro-Wright, one of the masterminds behind the scheme, was actually rewarded for his conduct and was promoted to CEO of Wal-Mart Stores USA.  Such a scheme was in direct violation of the Foreign Corrupt Practices Act ("FCPA").

2.      As a result of the bribery scheme, which evidences Wal-Mart's absence of adequate internal controls to ensure compliance with the FCPA, Wal-Mart has been severely damaged in myriad activities that resulted in the Company's exposure to liability for violations of the FCPA. Despite the injuries to Wal-Mart, as a result of fines and/or legal expenses which could run into tens if not hundreds of millions of dollars, as well as significant reputational injury, no legal action has been taken against the Individual Defendants, or others within the Company, for their misconduct.  By this action, plaintiff seeks relief for Wal-Mart against the Individual Defendants.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. 1332(a)(2), because Plaintiff and the Individual Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a).   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

4.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. 1391(a)(1) because: (1) one or more Individual Defendants reside in this Judicial District; (2) Wal-Mart maintains executive offices in this Judicial District; (3) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred within this Judicial District; and (4) the Individual Defendants have received substantial compensation in this County by conducting

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      Page 2

business herein and by engaging in numerous activities that have had an effect in this Judicial District.

## THE PARTIES

5.      Plaintiff Kathryn Johnston Lomax currently owns 300 Wal-Mart shares.  Plaintiff is and has been a shareholder of Wal-Mart continuously since May 2010.

6.      Nominal Defendant Wal-Mart Stores, Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas. Wal-Mart Stores, Inc. is a corporation operating more than 8,500 stores transacting hundreds of millions of dollars of business in 15 countries. Wal-Mart's annual sales in 2011 exceeded $4.18 billion. The Company employed approximately 2.2 million employees worldwide as of the end of last year.

7.      S. Robson Walton is Chairman of the Board of Wal-Mart Stores Inc. Mr. Walton is the Chairman of Wal-Mart and has been a member of the Board since 1978. He joined the company in 1969. Prior to becoming Chairman in 1992, he held a variety of positions with the company, including Senior Vice President, Corporate Secretary, General Counsel, and Vice Chairman.

8.      Michael T. Duke is President, Chief Executive Officer, and a director of Wal-Mart Stores Inc. Mr. Duke is the President and CEO of Wal-Mart and has served in that position since February 1, 2009. Prior to this appointment, he held other positions with Wal-Mart since joining company in July 1995, including Vice Chairman with responsibility for Wal-Mart International beginning in September 2005 and Executive Vice President and President and CEO of Wal-Mart US beginning in April 2003. Mr. Duke has been a member of the Board since November 2008.

9.      H. Lee Scott, Jr., is a director of Wal-Mart Stores Inc. Mr. Scott was Wal-Mart's President and CEO from January 2000 through his retirement from that position on January 31,

2009. Mr. Scott served as an Executive Officer of Wal-Mart and as the Chairman of the Executive Committee until January 31, 2011, when he retired from the Company. Prior to serving as President and CEO of Wal-Mart, he held other positions with Wal-Mart since joining the Company in September 1979, including Vice Chairman and Chief Operating Officer from January 1999 to January 2000, and Executive Vice President and President and CEO, Wal-Mart US from January 1998 to January 1999. He has been a member of the Board since 1999.

10.     Jim C. Walton is Director of Wal-Mart Stores Inc. Mr. Walton is the Chairman and CEO of Arvest Bank Group, Inc., a group of banks operating in the states of Arkansas, Kansas, Missouri, and Oklahoma. Mr. Walton has been a member of the Board since 2005.

11.     Aida M. Alvarez is an independent director of Wal-Mart Stores Inc. Ms. Alvarez is the former Administrator of the U.S. Small Business Administration and was a member of President Clinton's Cabinet from 1997 to 2001. She was the founding Director of the Office of Federal Housing Enterprise Oversight from 1993 to 1997. Ms. Alvarez was a vice president in public finance at First Boston Corporation and Bear Stearns & Co., Inc. prior to 1993.

12.     James W. Breyer is an independent director of Wal-Mart Stores Inc. Mr. Breyer is a Partner of Accel Partners, a venture capital firm, a position he has held since 1987. Mr. Breyer is also the founder and has been the CEO of Breyer Capital, an investment firm, since July 2006. Mr. Breyer is also a co-founder and has been co-lead on the strategic investment committee since inception of the IDG-Accel China Funds. He has served as a director of News Corporation since 2011, Dell Inc. since 2009, Brightcove, Inc. since 2005, Facebook, Inc. since 2005, and Prosper Marketplace, Inc. since 2005. He also served as a director of Marvel Entertainment, Inc. from June 2006 to December 2009, and RealNetworks, Inc. from October 1995 to June 2008. Mr. Breyer has been a member of the Board since 2001.

13.     M. Michele Burns is an independent director of Wal-Mart Stores Inc. Ms. Burns is the Executive Director and CEO of the Retirement Policy Center sponsored by Marsh & McLennan Companies, Inc., a global professional services and consulting firm, a position she has held since October 2011. Prior to that role, Ms. Burns was the Chairman and CEO of Mercer Inc., a subsidiary of MMC, from September 2006 until October 2011. She joined MMC in March 2006 and served as its Executive Vice President and CFO until September 2006. She is the former Executive Vice President, CFO, and Chief Restructuring Officer of Mirant Corporation, an energy company, where she served from May 2004 to January 2006. She served as the Executive Vice President and CFO of Delta Air Lines, Inc., an air carrier, from August 2000 through April 2004. She has also served as a director of The Goldman Sachs Group, Inc. since October 2011 and Cisco Systems, Inc. since 2003.

14.     James I. Cash, Jr., Ph.D., is an independent director of Wal-Mart Stores Inc. Dr. Cash is the James E. Robison Emeritus Professor of Business Administration at Harvard Business School, where he served from July 1976 to October 2003. Dr. Cash served as the Senior Associate Dean and Chairman of HBS Publishing while on the faculty of the Harvard Business School, and also served as Chairman of the MBA Program. While on the faculty of Harvard Business School, Dr. Cash's research focused on the strategic use of information technology in the service sector, and specifically the development of a performance measurement system for information technology organizations. Dr. Cash holds an advanced degree in accounting and has been published in accounting and information technology journals. He currently provides management development and consulting services through The Cash Catalyst, LLC, which Dr. Cash formed in 2009. He has served as a director of The Chubb Corporation since 1996 and of General Electric Company since 1997. Dr. Cash has served as a

director of a number of other public companies, including Phase Forward Incorporated from October 2003 to May 2009, and Microsoft Corporation from May 2001 to November 2009, and has served on the audit committees of several public companies. Dr. Cash has been a member of the Board since 2006.

15.     Roger Campbell Corbett is an independent director of Wal-Mart Stores Inc. Mr. Corbett is the retired CEO and Group Managing Director of Woolworths Limited, where he served from 1990 to 2006. He is a director of The Reserve Bank of Australia and Chairman of PrimeAg Australia. He is the Chairman of Fairfax Media Limited, where he also serves as Chairman of that company's Nominations Committee and formerly served as Chairman of that company's Audit and Risk Committee. He also is a director and non-executive Chairman of Mayne Pharma Group Limited, an Australian specialist pharmaceutical company, and a former member of the Prime Minister's Community Business Partnership. He is a former founding director of Outback Stores, a commercial venture supported by the government to provide retail facilities for communities in remote Australia. Mr. Corbett has been a member of the Board since 2006.

16.     Douglas Neville Daft is an independent director of Wal-Mart Stores Inc. Mr. Daft is the retired Chairman and CEO of The Coca-Cola Company, a beverage manufacturer, where he served in that capacity from February 2000 until May 2004 and in various other capacities, including responsibility for various international markets, since 1969. Mr. Daft has served as a director of The McGraw-Hill Companies, Inc. since 2003 and served as a director of Sistema-Hals from September 2006 until December 2009. He has also served as a director of Green Mountain Coffee Roasters, Inc. since December 2009, where he is a member of that company's compensation committee.

17.     Gregory Boyd Penner is an independent director of Wal-Mart Stores Inc. Mr. Penner has been a General Partner of Madrone Capital Partners, an investment management firm, since 2005. From 2002 to 2005, he served as Wal-Mart's Senior Vice President and CFO - Japan. Before serving in that role, Mr. Penner held the position of Senior Vice President of Finance and Strategy for Wal-Mart.com. Prior to working for Wal-Mart, Mr. Penner was a General Partner at Peninsula Capital, an early stage venture capital fund, and a financial analyst for Goldman, Sachs & Co. Mr. Penner has been a member of the board of directors of Baidu, Inc. since 2004 and of Hyatt Hotels Corporation since 2007. He also serves on the boards of directors of 99Bill Corporation and eHarmony, Inc. Mr. Penner has been a member of the Board since 2008.

18.     Steven S. Reinemund is an independent director of Wal-Mart Stores Inc. Mr. Reinemund is the Dean of Business and Professor of Leadership and Strategy at Wake Forest University, positions he has held since July 2008. Prior to joining the faculty of Wake Forest University, Mr. Reinemund had a distinguished 23-year career with PepsiCo, Inc., where he served as that company's Chairman of the Board from October 2006 to May 2007, and Chairman and CEO from May 2001 to October 2006. Prior to becoming Chairman and CEO, Mr. Reinemund was PepsiCo's President and Chief Operating Officer from 1999 to 2001 and Chairman and CEO of Frito-Lay's worldwide operations from 1996 to 1999. Mr. Reinemund has served as a director of Exxon Mobil Corporation, American Express Company, and Marriott International, Inc., all since 2007. He previously served as a director of Johnson & Johnson from 2003 to 2008. Mr. Reinemund is also a member of the board of trustees for The Cooper Institute. Mr. Reinemund has been a member of the Board since 2010.

19. Arne M. Sorenson is an independent director of Wal-Mart Stores Inc. Mr. Sorenson is the President and Chief Executive Officer of Marriott International, Inc. Previously, Mr. Sorenson was President and Chief Operating Officer of Marriott from May 2009 to March 2012, and has served as a member of the Marriott board of directors since February 2011. Mr. Sorenson served as Marriott's Executive Vice President and CFO from 1998 to 2009. He also previously held the additional title of Marriott's President, Continental European Lodging, in which capacity he was responsible for lodging operations and development in the continental European region. Mr. Sorenson joined Marriott in 1996 as Senior Vice President of Business Development. He also co-chairs Marriott's Green Council, whose mission is to integrate environmental sustainability into Marriott's business strategy. Prior to joining Marriott, he was a partner in the law firm of Latham & Watkins in Washington, D.C. Mr. Sorenson also serves as a member of the Board of Regents of Luther College. He has been a member of the Board since 2008.

20. Christopher J. Williams is an independent director of Wal-Mart Stores Inc. Mr. Williams is the Chairman and CEO of The Williams Capital Group, L.P., an investment bank. Since 2003, he has also served as the Chairman and CEO of Williams Capital Management, LLC, an investment management firm. Mr. Williams also serves as a trustee of the Williams Capital Management Trust, a registered investment company. He has served as a director of Caesars Entertainment Corporation (formerly Harrah's Entertainment, Inc.) from November 2003 to January 2008, and from April 2008 to the present. Mr. Williams has been a member of the Board since 2004.

21. Linda S. Wolf is an independent director of Wal-Mart Stores Inc. Ms. Wolf is the former Chairman and CEO of Leo Burnett Worldwide, Inc., a global advertising agency and

division of Publicis Groupe S.A. Ms. Wolf served in various positions with Leo Burnett and its predecessors from 1978 to April 2005, including as Chairman and CEO from January 2001 until April 2005. She serves as a trustee for investment funds advised by the Janus Capital Group Inc. and has served on the board of InnerWorkings, Inc., a provider of managed print and promotional procurement solutions, since November 2006. Ms. Wolf has been a member of the Board since 2005.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.     As directors of Wal-Mart, defendants owed fiduciary duties of candor, good faith, and loyalty to the Company and its shareholders. They are prohibited from engaging in self-dealing as well as unlawful corporate conduct, such as violations of the laws, rules and regulations applicable to Wal-Mart and its business, including the FCPA, including its books and records provisions.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wal-Mart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and directorial positions with Wal-Mart, each of the Individual Defendants had access to information concerning the Company's businesses and operations in foreign countries that are generally perceived as having less developed legal and regulatory frameworks and/or cultures in which requests for improper payments are not discouraged. Because operations in these countries involve a higher than normal risk of corruption, Wal-Mart's directors and officers had a fiduciary duty to install and administer an FCPA compliance program with controls and accounting systems sufficient to detect, deter and ultimately prevent the improper payments that appear to be at the heart of the FCPA-related investigations.

24.     At all relevant times, the Individual Defendants were the agents of each of the other Individual Defendants and were at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

25.     On April 21, 2012, THE NEW YORK TIMES, in an article titled "Wal-Mart Hushed Up a Vast Mexican Bribery Case," exposed Wal-Mart's extensive bribery scheme. This article is paraphrased in paragraphs 26-58 below.

### Pre-2005 Evidence of Wrongdoing

26.     In 2003, a report drafted by Kroll Inc., a leading corporate investigations and risk consulting firm, concluded that top Wal-Mart de Mexico executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags, and even disregarded local press accounts asserting that Wal-Mart de Mexico was "carrying out a tax fraud."

27.     In 2004, Maritza I. Munich, then general counsel of Wal-Mart International (a subsidiary of Wal-Mart), pushed Wal-Mart's Board to adopt a strict anti-corruption policy. This proposed policy prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart." It required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

### Wal-Mart International's General Counsel Discovers A Vast Bribery Campaign

28.     On September 21, 2005, Munich, then general counsel of Wal-Mart International, received an alarming email from Sergio Cicero Zapata ("Cicero"), a former executive at Wal-Mart de Mexico. In the email and follow-up conversations, Cicero described how Wal-Mart de Mexico had orchestrated a campaign of bribery to win market dominance.

29. Within days of receiving Cicero's e-mail, Munich hired Juan Francisco Torres-Landa, a lawyer in Mexico City, to debrief Mr. Cicero. The two men met three times in October 2005, with Munich flying in from Bentonville, Arkansas for the third debriefing.

30. During hours of questioning, Cicero described how Wal-Mart de Mexico had committed bribery, then hidden it all with fraudulent accounting. Cicero implicated Wal-Mart de Mexico's chief executive, Eduardo Castro-Wright and many of Wal-Mart leaders, including the Board Chairman, the general counsel, the chief auditor and the top real estate executive at the time.

31. Cicero said that while bribes were occasionally paid before Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job in 2002. Cicero described how Wal-Mart de Mexico's leaders had set "very aggressive growth goals," which required opening new stores "in record times." Wal-Mart de Mexico executives, Cicero said, were under pressure to do "whatever was necessary" to obtain permits for building new stores.

32. Cicero also explained to Torres-Landa the mechanics of how he had helped funnel bribes through trusted fixers, known as "gestores." According to Cicero's description, it was his job to recruit the gestores. Cicero worked closely with them, sharing strategies on whom to bribe. Cicero also approved Wal-Mart de Mexico's payments to the gestores. Each payment covered the bribe and the gestor's fee, typically 6 percent of the bribe. It was all carefully monitored through a system of secret codes known only to a handful of Wal-Mart de Mexico executives. The codes identified the specific "irregular act" performed. One code, for example, indicated a bribe to speed up a permit. Others described bribes to obtain confidential information or eliminate fines. Each month, Castro-Wright and other top Wal-Mart de Mexico executives

received a detailed schedule of all of the payments performed, Wal-Mart de Mexico then "purified" the bribes in accounting records as simple legal fees.

**Wal-Mart's Board Is Informed Of The Scheme**

33.     On October 15, a top Wal-Mart lawyer wrote an email to Defendant Duke, Wal-Mart's current chief executive and then Vice Chairman responsible for Wal-Mart International, giving a detailed description of Cicero's allegations.

34.     Moreover, Munich sent detailed memos describing Cicero's debriefings to Wal-Mart's senior management, including Thomas A. Mars, Wal-Mart's general counsel; Thomas D. Hyde, the Company's executive vice president and corporate secretary; Michael Fung, Wal-Mart's top internal auditor; Craig Herkert, the chief executive for Wal-Mart's operations in Latin America; and Lee Stucky, the chief administrative officer of Wal-Mart International.

35.     Wal-Mart's initial response was to turn to Willkie Farr & Gallagher ("Willkie Farr"), a law firm with extensive experience in FCPA cases. The firm's investigation work plan called for tracing all payments to anyone who had helped Wal-Mart de Mexico obtain building permits for the previous five years. The firm said it would scrutinize any and all payments to government officials and interview every person who might know about payoffs, including implicated members of Wal-Mart de Mexico's board. This is the type of independent investigation major corporations routinely undertake when confronted with allegations of serious wrongdoing by top executives.

36.     Wal-Mart rejected this approach. Instead, they decided Wal-Mart's lawyers would supervise a far more limited preliminary inquiry by in-house investigators. The inquiry would take two weeks, not the four months Willkie Farr proposed. Rather than examining years of permits, the team would look at a few specific stores. Interviews would be done only when

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    Page 12

absolutely essential to establishing the bona fides of Cicero. Only if the inquiry found a likelihood that laws had been violated would the company consider conducting a full investigation.

37.    Wal-Mart's internal investigation unit was ill-equipped to take on a major corruption investigation, let alone one in Mexico. It had fewer than 70 employees, and most were assigned to chasing shoplifting rings and corrupt vendors. Just four people were specifically dedicated to investigating corporate fraud, a number Joseph R. Lewis, Wal-Mart's director of corporate investigations, described in a confidential memo as "wholly inadequate for an organization the size of Wal-Mart."

**The Investigation Team Uncovers Substantial Wrongdoing**

38.    On November 12, 2005, Wal-Mart's internal investigation team ("Investigation Team"), led by Ronald Halter, got to work at Wal-Mart de Mexico's corporate headquarters in Mexico City. By day's end, they had found 441 gestor payments. Each was a potential bribe, and yet they had searched back only to 2003. The amount of the bribes uncovered totaled at least $24 million.

39.    The Investigation Team found that nearly half the payments were to Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, Cicero's two main gestores and lawyers. These two lawyers alone had received $8.5 million in payments. Records showed Wal-Mart de Mexico routinely paid its gestores tens of thousands of dollars per permit.

40.    The Investigation Team confirmed details from Cicero's debriefings, including names, dates, bribe amounts, and mysterious codes at the bottom of invoices from the gestores. The Investigation Team also found clear confirmation that Castro-Wright and other top executives at Wal-Mart de Mexico were well aware of the gestor payments.

41.     The Investigation Team discovered that in March 2004 the executives at Wal-Mart d Mexico had been sent an internal Wal-Mart de Mexico audit that raised red flags about the gestor payments. The audit documented how Wal-Mart de Mexico's two primary gestores had been paid millions to make facilitating payments for new store permits all over Mexico. The audit did not delve into how the money had been used to "facilitate" permits, but it showed the payments rising rapidly, roughly in line with Wal-Mart de Mexico's accelerating growth. The audit recommended notifying headquarters of the payments. This recommendation was removed by Wal-Mart de Mexico's chief auditor, whom Cicero had identified as one of the executives who knew about the bribes. The author of the gestor audit, meanwhile, was fired not long after the audit was completed.

42.     The Investigation Team arranged to meet the fired auditor at his hotel. The auditor described other examples of Wal-Mart de Mexico's leaders withholding from Wal-Mart headquarters information about suspect payments to government officials. The auditor told the Investigation Team that Rodríguezmacedo, the general counsel of Wal-Mart de Mexico, took significant information out of an audit of Wal-Mart de Mexico's compliance with the Foreign Corrupt Practices Act. The original audit had described how Wal-Mart de Mexico gave gift cards to government officials in towns where it was building stores.

43.     Upon receipt of the gestor audit, rather than expressing alarm, Rodríguezmacedo had appeared worried about becoming too dependent on too few gestores. In an e-mail, Rodríguezmacedo told Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits. He told Cicero that Castro-Wright wanted him to implement this plan as soon as possible. Cicero did as directed.

44.     In addition, the Investigation Team discovered that Wal-Mart de Mexico was making hefty "contributions" and "donations" directly to governments all over Mexico — nearly $16 million in all since 2003. The Investigation team wrote in one report back to Wal-Mart headquarters: "Some of the payments descriptions indicate that the donation is being made for the issuance of a license." They also found a document in which a Wal-Mart de Mexico real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores. This discovery confirmed Cicero's allegation regarding those donations.

45.     When the Investigation Team interviewed Rodríguezmacedo, he said that the company had stopped using gestores after Cicero's departure. Yet even as Cicero was being debriefed in October 2005, Wal-Mart de Mexico real estate executives made a request to pay a gestor $14,000 to get a construction permit. Other Wal-Mart de Mexico executives gave the Investigation Team evasive responses.

46.     In December 2005, the Investigation Team wrote confidential reports to Wal-Mart's top executives laying out all the evidence that corroborated Cicero. "There is reasonable suspicion," Halter concluded, "to believe that Mexican and USA laws have been violated." There was simply "no defendable explanation" for the millions of dollars in gestor payments, he wrote.

47.     Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mart de Mexico. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history." Halter also proposed a thorough investigation of the two main gestores and a round of interviews with Wal-Mart de Mexico's senior executives.

**Defendant Scott Establishes A New Investigation Protocol**
**Which Sweeps The Investigation Under The Rug**

48. By January 2006, Wal-Mart's leaders were again weighing whether to approve a full investigation. In the midst of this debate, Munich submitted her resignation, effective Feb. 1, 2006. In one of her final acts, she drafted a memo that argued for expanding the Mexico investigation and giving equal respect to Mexican and United States laws. She also warned against allowing implicated executives to interfere with the investigation. Wal-Mart de Mexico's executives had already tried to insert themselves in the case.

49. Scott called a meeting for Feb. 3, 2006, to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Cicero's allegations. Along with Scott, the meeting included various members of the Investigation Team. Wal-Mart's leaders viewed the Investigation Team as overly aggressive. By meeting's end, Kenneth H. Senser, Wal-Mart's vice president for global security, aviation and travel, had been ordered to work with Mars, Wal-Mart's general counsel, and others to develop a "modified protocol" for internal investigations.

50. Scott said he wanted it done fast, and within 24 hours Senser produced a new protocol that gave senior Wal-Mart executives, including executives at the business units being investigated, more control over internal investigations. The policy included multiple "case reviews." It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation. Under the new protocol, Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives. Lesser allegations would be left to the affected business unit to investigate.

51. Four days after Mr. Scott's meeting, with the new protocol drafted, Wal-Mart's leaders began to transfer control of the bribery investigation to one of its earliest targets,

Rodríguezmacedo. Mars first sent Halter's report to Rodríguezmacedo and arranged to ship Halter's investigative files to him as well.

52.    Rodríguezmacedo wrapped up the case in a few weeks, with little additional investigation. Largely based on the denials of his fellow executives, his six page report concluded that "[t]here is no evidence or clear indication of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."

53.    Rodríguezmacedo submitted a draft of his report to the headquarters. In an e-mail, Lewis told his superiors that he found the report "lacking." It was not clear what evidence supported the report's conclusions.

54.    As a result of the wrap up of the investigation, neither American nor Mexican law enforcement officials were notified of any bribery, and no Wal-Mart executives were disciplined.

**THE NEW YORK TIMES Uncovers Possible Violations of the FCPA**

55.    In December, after learning of THE NEW YORK TIMES' reporting in Mexico, Wal-Mart informed the Justice Department that it had begun an internal investigation into possible violations of the Foreign Corrupt Practices Act.

56.    On December 8, 2011, in a Form 10-Q filing, Wal-Mart announced that:

During fiscal 2012, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. As a result of information obtained during that review and from other sources, the Company has begun an internal investigation into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company has engaged outside counsel and other advisors to assist in the review of these matters and has implemented, and is continuing to implement, appropriate remedial measures. The Company has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission.

57.    Wal-Mart did not reveal additional details about the internal investigation, such as whether the investigation already had or could possibly expose Wal-Mart to liability for

violations of the FCPA. Nor did the Form 10-Q filing reveal additional facts regarding the scope, duration, outcome, or possible impact of the governmental and/or internal investigations on Wal-Mart financially or otherwise.

58.     On April 21, 2012, THE NEW YORK TIMES, in an article titled "Wal-Mart Hushed Up a Vast Mexican Bribery Case," publicly revealed the details of the bribery scheme. As a result, Wal-Mart shares dropped from a close of $62.45 to close at $59.54 on the following trading day, on very high volume.

59.     On April 26, 2012, the Mexican Attorney General's Office announced that it was investigating the Wal-Mart bribery scheme.

60.     On April 29, 2012, THE NEW YORK TIMES reported, in an article titled "Wal-Mart's U.S. Expansion Plans Complicated by Bribery Scandal," that Wal-Mart's plans to build new stores in various locations, including Brooklyn, California, and Boston, were put in jeopardy over this scandal.

## DAMAGE TO WAL-MART

61.     Wal-Mart has been and/or will be forced to incur tens or hundreds of millions of dollars in costs and expenses in connection with the investigations into its compliance with the FCPA. This amount does not include the pecuniary penalty that the Company will likely have to pay to resolve any civil or criminal charges that may arise from its non-compliance with the FCPA, which could also run into the tens, if not hundreds of millions of dollars. Furthermore, Wal-Mart has suffered significant reputational harm as a result of the bribery scheme. Such reputational harm has a concrete effect; various domestic expansion plans to open new Wal-Mart stores have been put in jeopardy by this scandal. By this action, plaintiff seeks redress for and vindication of Wal-Mart's rights against its wayward fiduciaries.

## DEMAND IS EXCUSED

62.     Plaintiff did not make a demand on Wal-Mart's Board to institute this action because such a demand would be futile, as a majority of the Board is interested and lacks independence. Further, all current Board members have demonstrated their unwillingness and inability to address the claims alleged herein seeking pecuniary and other relief to compensate Wal-Mart for the wrongdoing alleged herein. Thus, Plaintiff did not make a demand on the current Board before instituting this action because the factual allegations herein create a reasonable doubt that a majority of the Individual Defendants could have properly exercised independent and disinterested business judgment in responding to such a demand. Specifically, Wal-Mart's Board refused to act concerning an investigation into the bribery scheme in the past, and there is no reason they will do so now.

## COUNT I

## BREACH OF FIDUCIARY DUTY

63.     Plaintiff incorporates ¶¶ 1-62.

64.     The Individual Defendants, and each of them, owed to the Company the duty to exercise candor, good faith and loyalty in the management and administration of Wal-Mart's business and affairs, particularly in foreign countries with less developed legal and regulating frameworks and/or that are generally perceived as having cultures that do not discourage improper payments to obtain or retain business.

65.     Individual Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather to their intentional breach or reckless disregard of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants, and each of them, intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of Wal-Mart.

66.     In breach of their fiduciary duties owed to Wal-Mart, the Individual Defendants, and each of them, willfully participated in and caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds, and failed to properly oversee Wal-Mart's business, rendering them personally liable to the Company for breaching their fiduciary duties.

67.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wal-Mart has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in Wal-Mart's favor against all defendants as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Wal-Mart and that plaintiff is an adequate representative of the Company;

B.     Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wal-Mart;

C.     Determining and awarding to Wal-Mart the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Determining and awarding to Wal-Mart exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.     Awarding Wal-Mart restitution from defendants, and each of them;

F.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

G. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 1, 2012

Respectfully Submitted,

WYLY ~ ROMMEL, PLLC
James C. Wyly
Arkansas Bar No. 90158
jwyly@wylyrommel.com
Sean F. Rommel
Arkansas Bar No. 94158
4004 Texas Boulevard
Texarkana, TX 75503
Telephone: (903) 334-8646
Facsimile: (903) 334-8645

**MURRAY FRANK LLP**
Brian P. Murray
Gregory B. Linkh
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

**Counsel for Kathryn Johnston Lomax**

## VERIFICATION

I, Kathryn Johnston Lomax, hereby verify and declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") in this action. The allegations contained within the Complaint are true and correct to the best of my knowledge, information, and belief. I have also authorized the filing of this Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Kathryn Johnston Lomax

Dated: April 30, 2012